IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

JEREMEY S. KIMBRELL,                    )
                                        )
          CLAIMANT,                     )
v.                                      )
                                        )     CIVIL ACTION NO.
NANCY A. BERRYHILL,                     )     4:16-CV-01210-KOB
ACTING COMMISSIONER OF                  )
SOCIAL SECURITY,                        )
                                        )
          RESPONDENT.                   )
                                        )
                                        )
                                        )

MEMORANDUM OPINION

I. INTRODUCTION

On October 8, 2012, the claimant, Jeremey S. Kimbrell, protectively applied for a period

of disability and disability insurance benefits, and for supplemental security income, under Titles

II and XVI of the Social Security Act. He alleged disability beginning August 15, 2008, for back

injury, scoliosis, degenerative disc disease, depression, and PTSD. Later, he amended his

complaint to allege disability beginning November 1, 2011. The Commissioner denied the claims

on December 12, 2012. The claimant filed a timely request for a hearing before an

Administrative Law Judge. The ALJ held an initial hearing on April 4, 2014. After the record

developed more fully, ALJ held a subsequent hearing on October 1, 2014. (R. 227-29, 232-40,

258, 41, 263, 140-50, 93-124, 63-92).

In a decision dated December 16, 2014, the ALJ found that the claimant was not disabled

as defined by the Social Security Act, and was therefore ineligible for social security benefits.

The claimant submitted new medical records to the Appeals Council dated from February 13,

2015 to May 1, 2015. On May 20, 2016, the Appeals Council denied the claimant's request for review. Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner. (R. 41-51, 1-4).

## II. ISSUE PRESENTED

Whether substantial evidence supports the ALJ in his finding that the claimant's statements about his symptoms were not entirely credible, and whether the ALJ erred regarding Social Security Ruling 06-09p in failing to explicitly address the testimony of the claimant's wife and mother.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No ... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

1. Is the person presently unemployed?
2. Is the person's impairment severe?

3. Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
4. Is the person unable to perform his or her former occupation?
5. Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled." *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)1; 20 C.F.R. §§ 404.1520, 416.920.

## V. FACTS

The claimant was 34 years old at the time of the ALJ's final decision. He has a ninth-grade education and some vocational training in communications and electronic certifications, with past relevant work as an electrician, a carpenter, station installer and repairman, and supervisor of cable installation. He alleges disability based on degenerative disc disease, scoliosis, depression, post-traumatic stress disorder, and back injury. (R. 51, 227, 100-105, 120, 263).

*Medical Records Regarding Physical and Mental Impairments Prior to the ALJ's Decision*

On March 26, 2002, Dr. R. Andrew Vanbergen, a radiologist, obtained an MRI of the claimant, which revealed evidence of early disc degeneration at the L5-S1 of the claimant's spine, contacting the left S1 to the nerve root. (R. 429).

The claimant alleges that sometime in 2005, he fell 15-20 feet from a telephone pole and landed on a fence. The claimant states that he went to the emergency room, that the emergency room doctor at the time reportedly recommended lower back surgery, but that the claimant decided on the more conservative treatment of physical therapy. The record contains no notes of these visits. The claimant stated that he continued working. (R. 469-72).

On March 28, 2005, because of lower back pain that he had been experiencing for a few

weeks up to that point, the claimant sought treatment with Dr. Jeffrey M. Saylor, a family practitioner. Dr. Saylor prescribed Mobic for the pain and recommended the claimant follow up with Dr. Franklin Calame Sammons, an orthopedic surgeon. (R. 328).

On April 4, 2005, Dr. Sammons evaluated the claimant. Dr. Sammons found that the claimant could stand erect and had no evidence of scoliosis or muscle spasms. The claimant complained of some discomfort in the lumbosacral regions with more pain associated with extension than flexion. The claimant showed normal rotary motions. He could walk in a normal heel to toe gait. His repetitive tiptoe raises were normal. Passive straight leg raises were negative at 90 degrees and caused some pain. Indirect straight leg raises were negative. Bilateral active straight leg raises caused some pain, and lying in a prone position was mildly painful. The claimant's sensory exam was normal, as were his pulses and knee and ankle reflexes. His motor exam showed full 5/5 strength for his quadriceps, anterior tibialis, extensor halluces longus, and the long flexors. Dr. Sammons also obtained x-rays, which revealed minor narrowing at L5-S1 level of the claimant's lumbar spine. Dr. Sammons diagnosed the claimant with chronic discogenic back pain secondary to central paracentral herniated nucleus pulposus (HNP) without neurologic deficits. At the time, Dr. Sammons indicated that the claimant "is not ready to consider surgical intervention." Dr. Sammons recommended exercises and gave the claimant a prescription for an anti-inflammatory. The claimant made no follow-up appointment, but the doctor told the claimant to return if his symptoms changed or worsened. (R. 431-32).

The next relevant medical record occurred almost six years later, on March 23, 2011, when the claimant went to the emergency room with mental health issues. Specifically, the ER doctor treated the claimant for depression, narcotics use, anxiety, panic attacks, and a suicide attempt. The record assessed the claimant's pain at level 0. Although the record noted chronic

pain, no physician wrote a prescription for pain medication. The ER assessed the claimant's condition as stable. He had a positive drug screen. His suicidal ideation was at level 1 lethality (no predictable risk of immediate suicide) as his suicidal ideation had no specific plan of fulfillment. The ER told the claimant to follow-up with his primary care physician, but the record does not indicate that he did so. (R. 310-23).

On December 12, 2011, the claimant went to the ER for acute lower back pain in the lumbar region. The claimant stated that the pain had started one day prior to the ER visit when he bent over to tie his shoes. The claimant exhibited pain with normal range of motion. He was prescribed pain medication. (R. 304-09).

On April 12, 2012, Dr. Saylor examined the claimant again for back pain issues. Dr. Saylor diagnosed inflammation of the left leg and hip and noted the claimant's history of a herniated disc. Dr. Saylor gave the claimant two steroid injections for pain and a prescription for Medrol Dosepak (a steroid), Flexeril (a muscle relaxant) and Norco (an opioid pain reliever). (R. 327-36).

On July 7, 2012, the claimant returned to see Dr. Saylor for "past 8 days of severe back pain radiating down to the leg." Dr. Saylor refilled the claimant prescriptions and wrote prescriptions for Lortab (for pain) and Neurontin (for neuropathic pain). Dr. Saylor told the claimant to follow-up with a surgeon "when possible," but the record does not indicate whether the claimant did so. (R. 326-35).

On February 8, 2013, Dr. Saylor found that the claimant had normal range of motion in his spine, normal gait and that he could stand without difficulty. (R. 350-53).

On May 17, 2013, the claimant visited Dr. Saylor because his "pain developed gradually several months ago." Dr. Saylor found that the claimant had normal range of motion in his spine,

normal gait and could stand without difficulty. Dr. Saylor told the claimant to "call or return if symptoms worsen or persist." (R. 354-57).

On August 4, 2013, Edmond Safarian, M.D. examined the claimant in the emergency room. The claimant complained of back pain of four days duration. The claimant showed normal range of motion, except that he had a mildly limited range of motion in his back. By the time of his check-out that same day, the claimant said his symptoms had improved. The doctor gave the claimant a prescription for pain medication. (R. 383-95).

On September 10, 2013, the claimant visited Dr. Saylor because his "pain developed gradually several months ago." Dr. Saylor found that the claimant had normal range of motion in his spine, normal gait and could stand without difficulty. Dr. Saylor advised the claimant to "call or return if symptoms worsen or persist." (R. 358-61).

On December 5, 2013, Gregory Bledsoe, M.D., examined the claimant in the ER. Dr. Bledsoe found that the claimant exhibited acute cervical strain from a recent fall at home. Dr. Bledsoe prescribed Naproxen (a non-steroidal anti-inflammatory drug) and Flexeril. He also advised the claimant to follow-up with his primary care doctor, but the record does not indicate that he did so. (R. 366-82).

On January 2, 2014, the claimant visited Dr. Saylor because he had "pain which developed gradually several months ago." Dr. Saylor found that the claimant had normal spine range of motion, normal gait and could stand without difficulty. Dr. Saylor told the claimant to "call or return if symptoms worsen or persist." (R. 362-65).

On March 13, 2014, Dr. Pfitzer at Marshall Medical Center Emergency Department examined the claimant because of "moderate" intermittent pain because of lumbar strain. The specific diagnosis was sciatica. The claimant was prescribed Prednisone (anti-inflammatory) for

three days. (R. 415-24; 464-67).

On March 20, 2014, and April 14, 2014, Dr. Saylor examined the claimant. In both instances, the claimant gauged his pain as a 7/10. The pain was intermittent, and the area was tender with palpation. The claimant exhibited normal range of motion. (R. 457-63).

On April 26, 2014, Sathyan V. Iyer, M.D., a family practitioner, examined the claimant at the request of the Disability Determination Service. Dr. Iyer's exam revealed that, although the claimant leaned to his right while sitting to avoid putting pressure on his left side, that his muscle power of his left lower extremity was a 4/5, and that he was tender in his left lower back; nevertheless, the claimant's gait was normal, he could walk on heels and tiptoes, he could squat partially, and he had no sensory defects. Dr. Iyer concluded that the objective medical evidence supported the conclusion that the claimant would be significantly impaired in functions involving bending, lifting, overhead activities, pushing, pulling, and sitting or standing for long periods of time, but that the objective evidence did not support the conclusion that the claimant could not perform any substantial work. (R. 48, 469-79).

On April 28, 2014, Dr. Ken Hager, a diagnostic radiologist, performed an X-ray of the claimant's lumbar spine, which revealed minimal scoliosis. (R. 426).

On June 4, 2014, the claimant went to Marshal Medical Center Emergency Department for "an exacerbation of pain 4 days in duration." The claimant characterized the pain as 10/10. The pain was acute and focused in the lumbar area with sciatica radiating down his left leg. The claimant received an injection of Norco and prescriptions for Decadron (anti-inflammatory steroid) and Norflex (for pain). The ER doctor also advised the claimant to apply heat to the affected area and to follow up with his primary care physician. (R. 435-41).

On August 8, 2014, the claimant followed up with Dr. Saylor after his visit of June 4,

2014. The claimant gauged his pain as 7/10. His pain was intermittent. His lumbar region was tender with palpation, but his range of motion was normal. His ADLs (activities of daily living) were "doing well." Dr. Saylor also noted that the claimant was "doing well on meds" and refilled the claimant's prescriptions for Norco, and cyclobenzaprine (muscle relaxant), but did not refill the claimant's Percocet (opioid pain reliever) because the dosage was "too high." Dr. Saylor instructed the claimant to take his medications and to call or return if his symptoms worsened. (R. 454-56).

*The First ALJ Hearing*

*The Claimant's Testimony*

At the hearing before the ALJ on April 4, 2014, the claimant testified that he had worked various jobs as an electrician, cable installer, form carpenter, and contractor. He was a project manager for Comcast until his employer laid him off in 2008. He worked briefly in 2011 at a chicken processing plant, but quit after a day and a half, because of "back problems." (R. 101-06).

The claimant testified that, at age 22, he fell from a telephone pole while working, but never filed a workman's comp claim and continued to work. The claimant further testified that, in 2005, a doctor told him that he needed back surgery, but he continued to work because his wife was in college. (R. 107).

Since filing his disability application, claimant testified that he had never been in the hospital overnight, but that he had been to the ER at Marshall Medical Center North and Marshall Medical Center South. The claimant testified that, besides the ER doctors, he was only able to see Dr. Saylor, because of lack of insurance. (R. 108).[1]

---

[1] One page is missing from the transcript in the record, between pages 108 and 109.

The claimant testified that he was taking the following pain medications: 10 milligrams of Norco, 10 milligrams of oxycodone three to four times a day, and hydrocodone (three opioid pain relievers), as well as aspirin four to five times per day. When asked about side effects, the claimant testified that the Norco sometimes made him "a little drowsy," and that the oxycodone made him "real irritated feeling, kind of like my blood pressure is up or something." (R. 109-110).

When asked to rank his back pain on a ten-point scale, the claimant replied that when he goes to the ER, "it's probably about an 8, pushing a 9." On average, he stated that the pain is constantly about a 6 with medication. When asked how many days per month his pain was an 8 with medication, the claimant replied that it was about six days, spread over the month. When asked what he does on days when his pain is an 8, besides go to the emergency room, the claimant stated that he spends most of the day on his back with his feet elevated. (R. 110-114).

The claimant stated that his left leg will go numb if he stands in a stationary position for a few minutes, but that he can stand 10-15 minutes if necessary. He also testified that, although he used to run 14 miles a week, he now has difficulty walking short distances. He stated that he could possibly sit for 30 minutes before having to lie down to decompress his back. He usually puts his socks on before going to bed, because he is more "loosened up" in the evenings and he cannot bend over in the mornings. (R. 114-116).

Regarding his activities of daily living, the claimant testified that he typically wakes up between 8:00 and 9:00 a.m., prepares coffee, takes Norco for pain, takes care of his personal needs, and periodically spends 10-15 minutes at a time picking things up around the house. He breaks up his activities throughout the day to lie on his back for 30-45-minute periods, adding up to approximately 6 hours recumbent out of an 8-hour day. The claimant stated that he rarely

leaves the house except to occasionally go grocery shopping with his wife, does not have any social activities, and has not been to church in about two years. He usually goes to bed around 11:00 p.m., but has trouble sleeping because his medication "makes [his] mind race." (R. 116-118).

The ALJ asked the claimant about a mental health ER visit in 2011, in which the claimant had suicidal thoughts. The claimant described the incident as a "nerve breakdown," stating that pain, over-medication, and feelings of failure had driven the incident. He stated that now he only takes medications prescribed by a doctor. (R. 118-119).

*Vocational Expert #1: Dr. John Long's Testimony*

Dr. John Long, a vocational expert, testified concerning the type and availability of the jobs that the claimant could perform. Dr. Long testified that the claimant's past relevant work as an electrician and carpenter is medium, skilled work, and that his past relevant work as a cable installer and supervisor of cable installation is light, skilled work. The ALJ asked Dr. Long whether the claimant could perform his past relevant work if limited to the following restrictions: working at a light level of exertion, avoiding unprotected heights, and avoiding exposure to hazardous moving machinery or continuous vibrations. Dr. Long stated that under those restrictions, the claimant would only be able to work as supervisor. The ALJ then asked, assuming the existence of no vocationally relevant work, whether the claimant could perform any jobs in the national economy. Dr. Long testified that the claimant could perform light, unskilled work, such as a cashier, production assembler, or small product assembler. The ALJ then asked whether any jobs were available if the claimant could only perform sedentary work. Dr. Long testified that the claimant could perform sedentary, unskilled work, such as order clerk cashier, surveillance systems monitor, or an assembler. When asked about whether an employer

would tolerate absenteeism in these jobs, Dr. Long testified that an employer would not tolerate any absenteeism in the first 90 days, and afterwards, would tolerate no more than two absent days per month. (R. 120-121).

The ALJ then asked Dr. Long whether the claimant could perform any jobs if the ALJ credited the claimant's subjective testimony. Dr. Long testified that the claimant could perform no work if the ALJ credited the claimant's subjective testimony, because the claimant would lack adequate focus to concentrate on and persevere with his work. (R. 123).

*The Second ALJ Hearing*

*Medical Expert: Dr. James Anderson's Testimony*

Because of additional evidence subsequent to the initial ALJ hearing, the ALJ presided over a secondary hearing on October 1, 2014. At the hearing, Dr. James Anderson, a medical expert, after examining the claimant's medical records, testified that the claimant is a 34-year-old male with chronic lower back pain and a history of L5-S1 disc disease since 2002. Dr. Anderson noted that the claimant's treatment records were sporadic — two visits in 2012 and three in 2014 with a family doctor, plus intermittent visits to the ER. Dr. Anderson further noted that an x-ray showed mild degenerative disc disease of the claimant's lumbosacral spine, yet the claimant's physical exam was generally normal except for restrictions in the range of motion because of pain. Dr. Anderson opined that the claimant's records did not meet the Secretary's listings for disability, and concluded that the claimant could perform light work activity, with a sit-stand option preferred but not required. (R. 68-69).[2]

When asked about whether the claimant's condition had worsened since 2002, Dr. Anderson stated that the only objective medical evidence that was different were mild changes in

---

[2] Two pages are missing from the transcript in the record, between pages 78 and 79.

the claimant's lumbosacral spine. Dr. Anderson noted that such mild changes usually occur in old and chronic diseases rather than acute ones. (R. 79)

*Vocational Expert #2: Dr. David Head's Testimony*

Dr. David Head, a vocational expert, testified that the claimant could not perform his past relevant work, but that he could perform light jobs in a sit-stand manner: for example, surveillance system monitor, telephone quote clerk, or an assembly job that did not require production quotas. Dr. Head also noted that, over the course of an 8-hour workday, the claimant would have to sit a cumulative 4 hours, stand a cumulative 2 hours, and walk a cumulative 2 hours. (R. 81-86).

Dr. Head also testified that an employer would not tolerate more than two absent days per month, or 20 absent days per year. Furthermore, a worker at such a job could not be off-task more than 15-20 percent of the time. (R. 82-83). When asked whether the claimant's need to frequently stand up and sit down would affect his ability to stay on task, Dr. Head admitted that "it could be a negative vocational factor." Dr. Head suggested that the claimant could arrange his work materials so that he could access them from a standing position. When asked whether the inability to sit an 8-hour shift would further reduce the number of light, sedentary jobs available to the claimant. Dr. Head admitted that that could possibly limit the accessibility of such jobs by as much as 50 percent. (R. 88-90).

The ALJ asked Dr. Head to hypothesize that the claimant could perform work at a light level of exertion, but could not sit more than 30 minutes at a time without standing or walking for 2-5 minutes. Dr. Head said that, under that hypothesis, the claimant could perform the jobs just named, as well as the jobs listed by Dr. Long in the previous hearing, for example, a cashier. (R. 90-91).

*The ALJ's Decision*

On December 16, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 41-51). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through June 30, 2013, and had not engaged in substantial gainful activity since his alleged onset date of November 1, 2011. (R. 43).

Next, the ALJ found that the claimant had the severe impairments of degenerative disc disease of the lumbar spine with herniated nucleus pulposus (deterioration of spinal disc) at L5-S1 and left lower extremity radiculopathy (compressed nerve in the spine). The ALJ acknowledged that these impairments significantly limited the claimant's ability to work for step 2 purposes. However, the ALJ did not credit the claimant's allegation that depression and PTSD hindered his ability to work, noting the dearth of evidence in the record for such mental impairments, aside from one recorded ER visit from March 2011 for depression and suicidal ideation in which the claimant drug screen was positive for benzodiazepine, amphetamine, and methamphetamine. The ALJ further noted that, during the hearing, the claimant did not argue that mental health symptoms affected his ability to work. (R. 44).

The ALJ next found that the claimant lacked any impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ gave great weight to the opinion of Dr. Anderson, the medical expert, who stated that the claimant's impairment did not meet or equal the severity of any listed impairment. The ALJ considered whether the claimant met the criteria for Listing 1.04, involving spine disorders, and found that the claimant's impairments did not meet the listing because no evidence exists in the record that the claimant has any one of the listed disorders. (R. 44).

Next, the ALJ determined that the claimant has the residual functional capacity to perform sedentary work, except that he could frequently lift/carry up to 10 pounds; occasionally lift/carry up to 20 pounds; never lift/carry 21-100 pounds; sit for 30 minutes uninterrupted; walk for 30 minutes without interruption; sit for a total of 4 hours, stand for a total of 2 hours, and walk for a total of 2 hours per 8-hour workday; occasionally reach overhead; occasionally reach all other directions; occasionally push/pull with the right and left hand; frequently handle, finger, and feel with either hand; occasionally operate foot controls with either foot; occasionally climb stairs, ramps, ladders, and scaffolds; occasionally balance; never stoop, kneel, crouch, or crawl; never be exposed to unprotected heights[3]; occasionally be exposed to moving parts, humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold and heat, and vibrations; and occasionally operate a motor vehicle. (R. 45).

In making this finding, the ALJ considered symptoms and corresponding medical record, including medical opinion and reports and testimony provided by the claimant and the claimant's wife and mother. The ALJ concluded that, although the claimant's impairments could reasonably be expected to cause his symptoms, the claimant's allegations of severe and debilitating pain were not entirely credible, because the objective medical evidence did not support the severity and persistence of the pain. (R. 49).

The ALJ then found that the claimant could perform work at the sedentary level, and that such jobs existed in significant numbers in the national economy. As such, the ALJ concluded that the claimant was not disabled under the Social Security Act. (R. 51).

*Medical Records After the ALJ's Decision*

The claimant submitted additional records to the Appeals Council regarding physician

---

[3] The ALJ's determination that the claimant could occasionally climb ladders and scaffolds appears to conflict with his determination that the claimant could never be exposed to unprotected heights.

encounters subsequent to the ALJ decision. (R. 6).

On January 29, 2015, Dr. Sammons examined the claimant. Dr. Sammons notes that the claimant reported that he had suffered back problems "on and off for years, but it has gotten worse." At the time, the claimant gauged his pain as 5/10. He was within 6 inches of touching his toes and experienced pain with flexion. The claimant could heel-to-toe walk normally. X-rays taken at the time showed some narrowing of the L5-S1 foramina of the lumbar spine, with some enlargement of the facets at the 2-3, 4-5, and 5-1 regions of the spine, but no osteolytic or osteoblastic activity. Dr. Sammons gave samples of Lyrica (for pain relief) and scheduled an MRI scan. Dr. Sammons noted that if the claimant had compression, he would consider an epidural injection, or if no compression, would pursue physical therapy. Dr. Sammons instructed the claimant to decrease the Vicoprofen (an opioid pain reliever and anti-inflammatory drug). (R. 480-82).

On February 5, 2015, Dr. Sammons examined the claimant to discuss the results of his MRI scan. The MRI revealed a large L5-S1 left paracentral disc herniation with encroachment on the descending S1 nerve root. Dr. Sammons noted that the claimant might ultimately require a fusion, but recommended just a decompression at the 5-1 level. Dr. Sammons noted that the claimant would have to be out of work for 8 weeks following the surgery, and would have to refrain from any heavy lifting during that time. The claimant decided to schedule the decompression procedure. (R. 483).

On February 13, 2015, as treatment for the claimant's left-S1 radiculopathy, Dr. Sammons performed an osteotomy on the L5-S1 on the left of the claimant's lumbar spine region (i.e. cutting bone to shift weight from a damaged area of the spine to a healthy area of the spine). Dr. Sammons also performed a foraminotomy of L5-S1 (to take pressure off the spinal column

nerve) and removal of osteophytes (bony outgrowths) on the posterior inferior aspect of L5-S1. (R. 8).

On March 3, 2015, Dr. Sammons examined the claimant again after the claimant fell on ice[4], which led to pain in his ankle and lower calf. Dr. Sammons prescribed Prednisone, Norco, and Flexeril. (R. 23).

On April 16, 2015, Dr. Sammons examined the claimant post-operatively. Dr. Sammons found that the claimant had full range of motion with pain on extension, flexion and lateral bending past 60 degrees. The claimant showed 5/5 strength for the anterior tibialis, extensor longus and log toe flexors. His gait was normal. Dr. Sammons recommended that the claimant consider anterior interbody fusion at L5-S1 to improve his pain. At the time, the claimant was employed and undergoing physical therapy. The claimant decided at this visit to proceed with the surgery. (R. 19).

On May 1, 2015, Dr. Sammons performed an anterior exposure for repositioning of the L5-S1 interbody graft because the claimant had "fallen and re-injured himself." (R. 10-13).

On May 11, 2015, Dr. Sammons examined the patient because of pain in the claimant's right leg, possibly because of movement of the cage placed within the pedicles of L5-S1 during the surgery of May 1, 2015. Claimant said he could not stand or walk. An MRI done at the time of visit, however, found that the cage had not shifted. X-rays confirmed the proper positioning of the cage. During the visit, the claimant admitted taking two weeks' worth of Percocet in one week. Dr. Sammons strongly advised the claimant on the unsuitability of this action. Dr. Sammons wrote a prescription for more Percocet and samples of Lyrica to treat the pain. The claimant's wounds were clean and dry. (R. 18).

---

[4] The record does not convey the date of the fall. Apparently, the claimant slipped on ice and fell sometime in mid-to-late February to early March 2015.

On May 20, 2015, Dr. Sammons examined the claimant because of persistent pain in his right leg. Prior to the visit, both the claimant's wife and mother had called Dr. Sammons requesting pain management on behalf of the claimant. Dr. Sammons gave the claimant a prescription for a steroid. The claimant admitted to non-compliance with the Lyrica. Dr. Sammons also prescribed 300 mg of Neurontin at bedtime along with Cymbalta (antidepressant), Tizanidine (muscle relaxant), OxyContin (opioid pain medication), and Percocet. (R. 17).

On May 28, 2015, the claimant sought treatment from Dr. Sammons because the claimant's "foot was on fire." Dr. Sammons reduced the claimant's OxyContin from 40 mg to 20 mg to 10 mg. and continued the claimant's Cymbalta and Lyrica. (R. 16).

On June 18, 2015, Dr. Sammons examined the claimant. The claimant was non-compliant on wearing the brace prescribed for him. Dr. Sammons prescribed Norco, Gabapentin (neurologic pain reliever), Cymbalta, and Tizanidine. Dr. Sammons cleared the claimant to continue to work with prohibitions on lifting and bending and with special admonitions to wear his brace. (R. 15).

## VI. DISCUSSION

### A. The Pain Standard Determination Regarding the Claimant's Testimony

The claimant argues that the ALJ erred in finding that the claimant's statements about his symptoms, especially his back pain, were not entirely credible. The court disagrees and finds that substantial evidence supports the ALJ's reasons for discrediting the claimant's statements about his medical conditions.

Disability cannot be based solely on a claimant's subjective description of pain. (U.S.C. § 423(d)(5)(A)). Rather, the ALJ must evaluate the claimant's subjective complaints under the Eleventh Circuit's pain standard. That standard requires the claimant to show evidence of an

underlying medical condition, *and* either objective evidence confirming the severity of the alleged pain, *or* that the objective medical condiction could reasonably produce the level of pain that the claimant alleges. *See Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). Therefore, an ALJ may reject a claimant's pain testimony, and the ALJ's determination will be reviewed to determine whether substantial evidence supports it. *Wilson*, 284 F.3d at 1226. If the ALJ rejects a claimant's pain testimony, the ALJ must explain why; however, the ALJ's decision need not specifically refer to every piece of evidence in the record. *See Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

In the present case, the court finds that substantial evidence supports the reasons the ALJ gave to discredit the claimant's subjective pain testimony, because, although the claimant's objectively-determined medical condition could cause some pain, the evidence does not support the claimant's testimony of the severity and persistence of the pain. (R. 49).

The claimant argues that the ALJ did not explain why he found the claimant's symptoms were not entirely credible. However, the ALJ offered two reasons for failing to credit the severity of the claimant's symptoms: the claimant's sporadic treatment history did not support the alleged severity of the claimant's pain; and also, objective medical evidence did not support the claimant's allegations regarding the persistence and severity of his pain.

 Regarding objective medical evidence, the ALJ noted that an x-ray from April 28, 2014 revealed minimal scoliosis with mild disc space loss at L5-S1 of the claimant's lumbar spine, but no additional disc, bony, or adjacent soft tissue abnormalities were present. (R. 48).

The medical records reflect that the claimant received treatment for back pain, but that the treatment was inconsistent with severe back pain. The ALJ also noted that the claimant did not seek treatment between April 2005 and December 2011, more than three years after the

claimant's initial alleged onset of disability date of August 15, 2008. (R. 47, 304-08, 431-32). Between April 2012 and late 2014, the claimant sought treatment with Dr. Jeffrey Saylor every few months. However, these exams revealed that, although the claimant had lower spine tenderness, he otherwise had relatively normal ranges of motion in his spine, and had full strength tone, normal reflexes, sensation, gait, and could stand without difficulty. Dr. Saylor proceeded with a conservative treatment regimen of pain medication. (R. 47, 351-52, 355-56, 363-64, 455-56, 458-59, 462-63). During this time, the claimant also visited the emergency room three times for complaints of back pain, yet the records indicate that the complaints were of mild to moderate back pain. (R. 47-48, 385, 419, 435-36, 444-45).

The opinion of Dr. Sathyan Iyer, a consultative examiner, similarly reflected that the claimant's pain was not severe enough to preclude work. Dr. Iyer examined the claimant on April 26, 2014. Dr. Iyer concluded from his exam that the claimant would be unable to perform work that involved much physical exertion or extended periods of standing; nevertheless, the claimant would could perform other gainful work. Dr. Iyer based his conclusion on the fact that the claimant had a normal gait, could walk on heels and tiptoes, squat partially, and had no sensory defects. (R. 48, 469-79).

The ALJ further relied on medical expert Dr. James Anderson, who opined that the medical record supported a finding of moderate pain, which would not preclude the claimant from working. Dr. Anderson noted that the record lacked much objective evidence of pathology and that claimant's physical examinations were generally normal, except for some restrictions of motion. Regarding the claimant's herniated disc, Dr. Anderson stated that the record supported a finding of moderate pain rather than severe pain as the claimant alleged. (R. 48-49).

The claimant argues that his treatment history subsequent to the ALJ's decision evidences

his pain was more severe than the ALJ acknowledged. (Pl.'s Br. at 7-8). However, because these surgeries did not occur until after the ALJ rendered his decision, they cannot undermine the ALJ's reasoning.

Evidence submitted to the Appeals Council after the ALJ's decision may warrant a remand only if the evidence is new, material, and chronologically relevant to the period at issue in the ALJ's decision. However, evidence is not relevant to the period at issue if the evidence shows a worsening of a condition or an onset of a new condition after the ALJ's decision date. See 20 C.F.R §§ 404.970(b), 416.970(b); *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1261 (11th Cir. 2007); *Stone v. Comm'r of Soc. Sec.*, 658 F. App'x 551, 553-54 (11th Cir. 2016). In the present case, the surgeries occurred after the ALJ's decision. Furthermore, the claimant's condition had possibly worsened by the time of the first surgery. Dr. Saylor, in his last records prior to the ALJ's decision, did not indicate that the claimant's condition merited surgical intervention, but continued to treat the claimant with medications only. (R. 454-6). Furthermore, in his consult following the ALJ's decision with Dr. Sammons, the claimant stated that his back problems "had gotten worse." (R. 480).

Also, the second surgery followed an accident that occurred after the first surgery, in which the claimant "fell and re-injured himself" after slipping on ice. (R. 12). The ALJ's decision does not need to be remanded for injuries subsequent to it. (*See Stone*, 658 F. App'x at 553).

For all these reasons, the court finds that the evidence submitted after the ALJ rendered his decision is not related to the period at issue and cannot be used to undermine the ALJ's assessment.

### B. The Testimonies of the Claimant's Wife and Mother

The claimant also argues that the ALJ erred in failing to give any weight to the statements

of the claimant's wife, Jenny Childers, and mother, Carol Thomas. The claimant states that if the ALJ had properly credited their statements, then their testimony would provide evidence of the severity of the claimant's impairments. (Pl.'s Br. at 8-9). The claimant cites Social Security Ruling (SSR) 06-03p, which the claimant interprets to require an ALJ to discuss the weight given to statements from laypersons. Therefore, the claimant argues that the ALJ should have explicitly addressed what weight he would have given to their statements.

However, SSR 06-03p does not require an ALJ to explicitly assign weight to every piece of evidence in the record from a *non-medical source*. *See Butler v. Astrue*, No. CA 11-00295-C, 2012 WL 1094448 *6 (S.D. Ala. 2012). Rather, SSR 06-03p requires that the ALJ must "consider" all relevant evidence from a claimant's case record, including opinions from the claimant's family.

In this case, the ALJ stated that he "considered opinion evidence in accordance with the requirements" of the law. Moreover, the ALJ specifically noted the "Third Party Function Report" and "Statement of Claimant or Other Person," both submitted by the claimant's mother, and the "Statement of Claimant or Other Person" submitted by the claimant's wife. In making his determination, the ALJ considered that the claimant's mother and wife alleged that the claimant had "significant limitations with respect to his activities of daily living and functional capacity." (R. 45).

Notably, the ALJ did not explicitly discredit the claimant's mother or wife's statements regarding the claimant's limitations. However, the law does not require the ALJ to explicitly discredit the statements of the claimant's mother and wife. See *Carter v. Astrue*, 228 F. App'x 967, 969 (11th Cir. 2007). When a layperson's statement duplicates and corroborates a claimant's subjective complaints, the ALJ can implicitly discredit that statement by explicitly

discrediting the claimant's subjective statements. *See Carter*, 228 F. App'x at 969.

In the present case, the written statements of the claimant's mother and wife regarding the claimant's limitations were almost identical to that of the claimant's. As discussed previously, the ALJ correctly articulated reasons to discredit the claimant's subjective testimony, and, thus, implicitly discredited the statements of the claimant's mother and wife.

The court finds that the ALJ correctly considered the statements of the claimant's mother and wife, implicitly discredited their statements, and committed no reversible error.

VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be AFFIRMED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 23rd day of August, 2017.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE